*Pamela A. Elisofon*
*Attorney-At-Law*
*26 Court Street - Suite 2515*
*Brooklyn, New York 11242*
*(718) 852-1700*
*Facsimile: (718) 852-2468*
*Pelisofon@yahoo.com*

April 22, 2010

Hon. Andrew L. Carter, Jr., Magistrate Judge
U. S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    <u>Vargas v. HPD</u>
             <u>1:09-cv-02940 (SLT) (ALC)</u>

Dear Mag. Judge Carter:

    This letter is intended to set forth my client's settlement position prior to our settlement conference at 11:00 a.m. on May 3rd.

    Plaintiff has demanded $200,000, a quite reasonable lump sum demand considering Defendants' exposure according to our calculations which were also shared with opposing counsel, as follows:

<u>Defendants' Exposure - Mathematical basis</u>:

Baseline:
Salary (calculated as of January 2009) …$54,000.00*
   *includes night differential
(less SSDI and WC - to be determined – from 12/23/07 )
                          Total Lost Back Pay (YEARS)(est.) =$108,000.00
Pain and Suffering and emotional damages (approx.)………..  200,000.00*
Punitive damages (approx.)……………………………….…  300,000.00*
Attorney's fees (estimate) ………………………………….…    30,000.00
Disbursements (filing fee) …………………………………….       250.00
Other disbursements (estimated)……………………….………      200.00
   (*figures based on statutory amounts permitted)
Lost Medical:
       Doctors …………………… $ 500.00/year (approx.)
       Prescriptions ……………… $ 4000.00/year (approx.)
       Transportation (out of pocket)$ 2500.00/year (approx.)
       Dental ……………………$ 700.00/year (approx.)

1

        Total Lost Medical per year:       $7,700.00 (approx.)
        $7,700.00 x 24 yrs to retirement (approx.) =       $184,800.00

    Lost Front pay:  $54,000.00 per year
    Age now =  42 yrs old; projected retirement age is
        66 yrs old;  24 years x $ 54,000.00/yr………      $1,296,000.00
        **TOTAL DAMAGES (ESTIMATED) =  $2,119,250.00**

### BACKGROUND OF CASE

    Plaintiff Alex Vargas holds an Associate's Degree in Occupational Studies from TCI College of Technology; he has many additional certifications and licenses regarding air pollution, air compressors, torch, boiler, fire sprinkler, and stand pipe; he holds an EPA universal license for refrigerate; he holds DEP and FDNY licenses; he studied HVAC/R at NYC Technical College and ACI Environmental Safety Training Institute.  Mr. Vargas has a total of 90+ college credits in engineering.  Mr. Vargas has been in the field working since 1987.

    Defendant New York City Department of Housing Preservation and Development ("HPD") is located at 100 Gold Street, New York, New York 10038.  Mr. Vargas worked for HPD at 94 Old Broadway, New York City, New York.  HPD employs more than 15 people, placing them within the purview of Title VII, and the New York State and New York City Human Rights Laws.  HPD is a government agency that enforces the laws and regulations regarding the unsanitary living conditions and safety of private and multiple dwellings in New York City.

    Alex Vargas was employed by HPD from April 12, 1999 to January 30, 2009, when he was terminated.  Mr. Vargas is a Christian who fervently practices the Catholic religion and often uses "God Bless You" in his speech. He has been diagnosed with a disability, to wit:  anxiety/panic attacks and he has herniated discs.

    Mr. Vargas's DCAS title was New York City Inspector – Housing.  He was a member of International Union of Operating Engineers, Local 211.  Mr. Vargas qualified for his job title by taking a civil service examination and passing it.  He also passed the supervisor's exam.

    Mr. Vargas was assigned to the Manhattan Borough Office, Division Code Enforcement, at 215 West 125th Street, New York.  And, to clarify the record further and avoid confusion, Mr. Vargas's job was classified as DCAS title "Inspector, Housing" and not Housing Inspector which applies to the New York City Housing Authority and not to HPD.

    **On January 2, 2008, the HPD denied Mr. Vargas's request for reasonable accommodation due to his documented disabilities, to wit: a partner to work with, a company car, etc.**

On December 7, 2007, by a letter authorized by Stanley Whing, HPD's EEO Officer, HPD stated that Mr. Vargas did not submit the proper medical documentation in support of his request for reasonable accommodation. (Please note that extensive medical documentation, indicating that Mr. Vargas was suffering from anxiety and herniated discs, had been submitted by Mr. Vargas, despite Mr. Whing's denial, to Supervisors Nelson Mas (per George Perez's instruction) and to Angel DeLeon, and to EEO Officer Stanley Whing all in October 2007. Note also that Mr. Mas even signed for received medical documentation on October 31, 2007.) Mr. Vargas provided hand-delivered original documentation to Mr. Mas, who informed Mr. Vargas that he would hold on to it and forward it to Deputy Chief Perez and Chief Frank Richards. When Mr. Vargas followed up and asked Mr. Mas about this documentation, Mas informed Mr. Vargas that Mas "doesn't know where it's located" and that Chief Frank Richards "has it." Yet in his letter dated December 7, 20007 Mr. Whing denied having the necessary documentation.

Mr. Vargas informed Mr. Mas that these were the documents required for a partner accommodation. <u>Mr. Mas refused to sign the ASP leave sheet</u>, and, upon subsequent inquiry, Mr. Mas stated that he didn't have the documents and that he gave these documents to Chief Frank Richards. Subsequently, in December, Mr. Whing stated that he never received these records. Mr. Vargas persisted in requesting the documents back from Mr. Mas, but he refused. Mr. Vargas could have personally forwarded these medical documents in the office mail, but instead he followed his supervisor's procedure by giving the medical documentation to his immediate supervisor.

## ADA:

In <u>violation of the Americans with Disability Act,</u> Defendant discriminated against Plaintiff Vargas in that Defendant has denied Mr. Vargas's request for reasonable accommodation. Due to his anxiety/panic attacks, and his inability to bend, squat or climb, with limitations on his ability to sit, stand and walk for prolonged periods of time, Mr. Vargas requested a partner to work with. When Mr. Vargas first began to work at HPD he had worked with a partner. In addition, numerous workers in Mr. Vargas's job title (even those with less seniority) had partners. Similarly situated inspectors worked with partners, even those without any disability. Mr. Vargas requested the use of an HPD car, which was also denied. Notwithstanding the aforestated, all of Mr. Vargas's accommodation requests were denied.

## TITLE VII:

Further, in <u>violation of Title VII of the Civil Rights Act,</u> Mr. Vargas was ridiculed several times by Deputy Chief Perez, who made fun of Mr. Vargas, telling him that "you are a G-d bless you man." Mr. Mas said, several times, that "G-d is not going to help you." Both Perez and Mas regularly made fun of Mr. Vargas for saying "G-d bless you" to his colleagues.

3

**FMLA:**

And, in violation of the Family Medical Leave Act, Mr. Vargas was not granted intermittent FMLA leave due to his ongoing medical condition, despite a request by his attorney's letter dated November 28, 2007.

**MISTREATMENT BY HPD:**

In addition to the above, Mr. Vargas was sent to dangerous locations by himself (without a partner) and was given an extra heavy workload. Statements were made to and about Mr. Vargas such as "you work slow." Similarly situated employee inspectors were given overtime (which could also be used as comp time); Mr. Vargas was not. When Mr. Vargas took a few hours for his physical therapy for treatment of his spine and then reported to work the same day, he was sent home unnecessarily, costing him to lose sick time and loss of pay. Other similarly situated employees would take a few hours to attend to their physical needs (i.e., doctor's appointments) and would then be permitted to work for the rest of the day so it didn't cost them sick time or salary.

Mr. Vargas was generally harassed and 'put down' by his supervisors, Mr. Mas, Mr. Perez and Chief Frank Richards. For example, Mr. Vargas was given a defective radio on a regular basis. Mr. Vargas was sabotaged in that his job-related submitted paperwork (i.e., reports) was scattered or went missing, making additional work for him. Mr. Vargas's work was unnecessarily criticized and he was often encouraged to change or modify acceptable work reports.

Other similarly situated inspectors were given city vehicles to perform their work; Mr. Vargas was denied same despite his many requests for accommodation. Mr. Vargas was criticized over the walkie-talkie radio system by Mr. Mas and others stating, "Why are you taking longer in your inspections?" Mr. Vargas was interrupted constantly with radio calls while he was conducting his inspections. Mr. Vargas's numerous requests for new batteries for the defective radios were denied.

Moreover, Mr. Vargas was told to go out on "disability" even though he was able to work at the time. And, when Mr. Vargas was selected for jury duty, his supervisors failed to accommodate him by changing his work schedule (and Defendant did not pay Mr. Vargas for the time he was on jury duty until almost a year later).

On 9/19/2007, while leaving the office, Mr. Vargas reported he was suddenly very ill and had heart-attack symptoms to his Tour 4 Supervisors. They left Mr. Vargas alone in the office in this emergency situation, even though Mr. Vargas was having an attack, and did not come to his aid. Subsequently, a Tour 3 Inspector and Supervisor came to his rescue, calling for an ambulance which picked him up and took him to St. Luke's Hospital where he was treated.

Mr. Vargas received training when he began at HPD in 1999, but although he has received a few updates over the years, they have not been annual. Although Mr. Vargas requested additional training many times, he was not granted same.

In or about October and/or November of 2007, Nelson Mas and George Perez, who are purportedly Christians, criticized Vargas's statements of "God Bless You" and criticized his listening to Family Radio, Station 94.7 FM, stating that "you shouldn't listen to that station because it is not a station 'Of God'." And, when Petitioner Vargas has said "God Bless You" to him in his office, George Perez has told him to "I don't want to hear that s-h-i-t – get out of here." This hardly supports HPD's statements that neither (Perez nor Mas) harbor religious animus toward Mr. Vargas.

In fact, there was even a pattern and practice of his supervisors losing Mr. Vargas's submitted work-related documents. On 10/3/2007, and again on 12/12/2007, Mr. Vargas was unable to find his route sheets which were left by him in the Tour 4 Supervisor's basket. In addition, according to contemporaneous notes taken by Mr. Vargas, he was harassed again by Mr. Mas on 10/3/2007 (and other days) as well.

Mr. Vargas often offered to work extended time, at regular pay, and/or overtime to make up for any time he took due to sickness or to attend medical appointments. HPD consistently denied him this option, even though he had seniority, giving the overtime to other favored employees. This was further indicia of harassment and punishment of Mr. Vargas for his physical disability.

As to HPD's assertions that a "far better reasonable accommodation would have been to find Mr. Vargas a suitable in-office assignment," this is mere pretext alleged by HPD. Mr. Vargas suggested an in-office assignment on numerous occasions, and was never offered one. As to offering an in-office assignment <u>in a lower job classification (with lower pay)</u>, this is not a reasonable accommodation. But, note that even this was not offered to Mr. Vargas either. This is hardly evidence of an "uncooperative approach." Mr. Vargas requested to work in the office due to medical necessity numerous times, but his supervisors refused to place him in the office. Now they disingenuously state that this would have been a better accommodation.

Mr. Vargas's medical insurance was terminated in January, 2008 and again approximately three times while he was out on Worker's Compensation leave. And, Mr. Vargas's Worker's Compensation application/ documentation which was timely submitted to Supervisor Mas was forwarded to superiors late – delaying the processing and causing Mr. Vargas to go without WC pay for a long period of time.

Further, in July 2008, while Mr. Vargas was out on WC leave, after inquiring of Mr. Linden about his late jury duty pay (approximately one year behind) because Mr. Vargas needed further income at the time, Mr. Vargas was sent a letter indicating that he had gone "AWOL."

5

No promotion has been offered to Mr. Vargas although he is overly qualified and experienced, despite the request for promotion made in the Elisofon Letter dated November 28, 2007. Mr. Vargas has taken and passed supervisor's tests, but was not offered a higher level position.

Explanation of Job Duties:

HPD Policy as to Partnering:

Some of the inspection process is not physically exhausting or demanding, but some inspections are physically exhausting and demanding. Buildings to be inspected according to law can vary from1-story private dwellings to 50-story buildings, to multiple dwellings. There are many cases that are physically exhausting and demanding such as, without limitation, "DIRES" which must be addressed immediately and may involve extensive travel, fire hazards, fumes; timed demands causing an excessive workload for an inspector; "HLB" involving case which may have over a thousand violations in one building; "DRK" involving multiple violations; "Amnesties" wherein inspectors check compliance by building owners from 1960's and later; and repetitive lead paint inspections, among others. The pattern and practice of HPD is to assign two inspectors (or more) in many situations other than high crime areas. Upon information and belief, two inspectors or more are used not only in high crime areas, but also in training situations where inspectors train other new inspectors (Mr. Vargas trained many new inspectors), in lead unit cases (where one inspector carries a laptop and one carries a briefcase and/or ladders and/or documents), <u>when an inspector doesn't feel well</u>[1], when one inspector can't drive a city vehicle and one who does drive is needed, when an inspector requests a partner (for any reason – including that they just don't feel well), when one inspector must stay in the car because there is no parking while another delivers documents to the main headquarters, when an inspector has car troubles with his/her personal vehicle a second inspector is assigned to drive their personal vehicle to transport the other inspector, when an inspector has no car and second inspector is assigned to drive him/her[2], in an emergency condition such as collapsing or damaged buildings, in a vacatur of a building, when a fire guard or fire watch is needed for a dangerous building situation, in a heavy workload situation such as a violation dismissal request, in a Housing Litigation Bureau case with a heavy workload, in a hazardous condition (inter alia, e.g., boiler problems, sewer hazards, electrical problems, structural damage), and when a religious accommodation is requested where an inspector must stop to pray during the day he is partnered. It is obvious that two person teams are used so often and so arbitrarily that a partner could have readily been given to Mr. Vargas due to his, inter alia, debilitating panic attack disorder. HPD's statement that "use of two person teams is needlessly duplicative and an unwarranted use of resources" is obviously a

---

[1] An inspector who comes in stating that s/he doesn't feel well is usually automatically given a partner by the supervisor even without a request for accommodation to the "downtown" office.

[2] Note that Mr. Vargas's supervisors did not accommodate him with a city vehicle with or without a partner, although Mr. Vargas requested one and other investigators were given one. Instead, his supervisors threatened to take away his HPD issued permit if he didn't use his own car.

6

pretext for the illegal failure to accommodate him. Moreover, it is noteworthy that Mr. Vargas has been sent in alone to heavy crime risk areas, risking his own personal safety and still got the job done.

Actions Taken by Mr. Vargas to Remedy His Situation:

Stanley Whing, EEO Officer, never responded to Mr. Vargas's requests for relief from harassment, job threats, and failure to accommodate him. Mr. Vargas contacted his EEO officer, Mr. Whing, speaking with him directly about the harassment, and Mr. Whing never took care of Mr. Vargas's problems. On one occasion, Mr. Vargas spoke with Mr. Whing on the telephone and Mr. Whing laughed at his complaints, showing extreme insensitivity and an unwillingness to accommodate Mr. Vargas. Mr. Vargas wrote a letter to Citywide Chief Cortine regarding the harassment, failure to accommodate, and adverse conditions under which he worked, and there was no response. Mr. Vargas wrote letters to the Disciplinary Unit at HPD, and although they investigated they did not intervene and improve the situation for Mr. Vargas. To avoid conflict and resolve the problems, Mr. Vargas also went to Mr. DeLeone, Supervisor, Deputy Chief Perez, and met with Chief Frank Richards and Nelson Mas, Supervisor, and with Mr. Egad, Office Manager. Mr. Vargas met with his two supervisors and the Deputy Chief and Chief in person and, although they stated they wanted to resolve the issues, no resolution came about. Mr. Vargas was always willing to avoid and resolve any conflicts.

Promotion Denied:

As to Petitioner's promotion, he was given two interviews (in 2001 and in 2006) and did not get the supervisor's position. There were many vacancies for supervisors at that time, because there were many provisional employees in place without civil service titles. Mr. Vargas successfully passed the civil service test and was placed on DCAS's duly certified civil service list in 2001. Placement went by the list, and also considered racial accommodation. Note that Mr. Vargas is Hispanic. Given his background, he should have been considered for the Associate Housing Inspector position. And, note that Mr. Vargas was never given a copy of the two interview documents generated by his two interviews.

Negative Evaluation:

Note that Mr. Vargas was given a negative evaluation in 2007. Mr. Vargas believes this evaluation was written in retaliation for Mr. Vargas's complaints. Nelson Mas pressured Mr. Vargas to sign this evaluation, but Mr. Vargas refused to sign it. Mr. Mas threatened and reprimanded Mr. Vargas – stating that, if Mr. Vargas did not sign the evaluation, he'd be in trouble with his superiors and implying that he'd lose his job. No copy of said evaluation was ever given to Mr. Vargas. Prior to that date he had never received any evaluation (since 1999).

   Mr. Vargas's treatment clearly evidences retaliation, as stated in his Complaint herein. Certainly, from the time of filing of his EEO Claims, Mr. Vargas was retaliated against.

   Thus, it is clear that Mr. Vargas has been a victim of discrimination and retaliation at the hands of HPD, and continues to suffer its affects.

            Respectfully submitted,

            ………………………………………….
            Pamela A. Elisofon (PAE6163)

Pae/pw